# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITES STATES OF AMERICA,

    Plaintiff,

                                                          Criminal No. 04-1211 WJ

RICHARD WILLIAM DAVIS and
MICHAEL KEVIN CUTCHEMBER,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court following a hearing held October 18, 2004, upon Motions to Suppress filed by Defendants Davis, Cutchember and Duvall, filed (respectively) August 23, 2004 **(Doc. 47)**, September 7, 2004 **(Doc. 72)**, and August 24, 2004 **(Doc. 49).** Defendants move to suppress an amount of approximately 92.5 kilograms of cocaine and other non-drug items, including a handgun, seized from a tractor trailer at the Port of Entry in Gallup, New Mexico on June 10, 2004. Defendant Duvall ("Duvall")[1] was driving, Defendant Cutchember ("Cutchember") in the passenger's seat, and Defendant Davis ("Davis") was in the sleeper portion of the truck.

### Background

The underlying facts are set forth in detail in the Government's brief, or based on Smid's testimony, unless otherwise noted. Also, except as otherwise noted, the Court accepts these facts as true and credible based on the testimony elicited at the hearing.

---

[1] Subsequent to the suppression hearing, the Court granted the Government's motion to dismiss without prejudice the indictment against Duvall.

New Mexico Department of Motor Transportation Officer James Smid ("Smid") is the inspector who conducted the inspection of the tractor trailer at the Gallup Port of Entry, which is a State of New Mexico permanent inspection station for commercial vehicles. Smid is a certified State of New Mexico law enforcement officer and a Transportation Officer certified by the United States Department of Transportation, Federal Motor Carrier Safety Administration to conduct all levels of commercial truck and trailer inspections. Inspectors make "judgment calls" when deciding what level inspection to conduct. (33).[2] A Level Three Driver/Credential inspection includes a roadside examination of the driver's license, medical certificate, logbook, seat belt, vehicle inspection report, turn signals, brake lamps, and hazardous materials inspection where applicable. A Level Two Walk-Around is inclusive of the Level III inspection, but the officer also inspects all safety equipment that can be examined without physically getting under the vehicle, such as lights, tires, emergency equipment, and safety belts. A Level One North American Standard Inspection is the most thorough, and includes an under-the-vehicle inspection, such as the brake cables and exhaust system. Both the Level II and Level I inspections allow an inspector to inspect the interior of van trailers to check for "safe loading." Deft (Davis) Exh. 3 at 8.

Smid was working in his booth when the tractor-trailer driven by an individual (later identified as Duvall) entered the Gallup Port of Entry. Smid asked Duvall for his New Mexico Tax Identification Permit, which Duvall was not able to produce. Duvall was also unable to produce a valid commercial driver's license ("CDL"). Smid asked for Duvall's logbook. According to Smid, Duvall hesitated, and looked at the front seat passenger (Cutchember), who

---

[2] Numbers in parentheses denote page numbers of the transcript of the hearing on the motion to suppress.

handed a logbook to Duvall, who in turn handed it to Smid.  Smid noticed that the logbook was not for Duvall as the driver, but for Cutchember, listing a "Richard Davis" as the co-driver.  Smid observed that Duvall appeared to be confused.  From the logbook entries, Smid noted that the two had not picked up any loads within the last few days, and that Cutchember had been off duty for seven days in Barstow, California, and was still off-duty.  In response to Smid's inquiry, Duvall told him he was hauling "orange juice."

Smid asked Duvall to pull into the parking lot to do a Level III inspection.  However, when he saw that Duvall had driven into the area in front of the bay doors where Levels I and II inspections are done, he informed the Duvall he would do a  Level II inspection.  There is some confusion among the Defendants as to whether Smid told them he was going to do a Level II or III inspection.  This matters little, since Defendants' position is that Smid's entry and search of the trailer exceeded the permissible scope of a Level II inspection.  Smid asked Duvall to exit the tractor and sit at a desk.  During the inspection, Smid noted that Duvall seemed nervous, fidgeting and adjusting his position in the chair continuously. Smid performed a Level II inspection and noted other violations, such as brake hose chaffing and an inoperable lamp.  Gov't Ex. 6.[3]  Duvall told Smid he was going to have a heart attack because he did not want to get a ticket.  From the front seat of the truck, Cutchember told Smid that a check will show that Duvall had a valid CDL.  During the inspection, Smid asked Duvall what was going on.  Duvall told Smid that he had a few days off and that he wanted to go out west with the passengers.  He also told Smid that he had

---

[3] Duvall claims that Smid did the inspection where he found the brake and lamp violations sometime *after* the Defendants were arrested.  There is no support for that contention.  Smid testified that he "entered the violations" before doing a cargo load securement check.  (48). The Government's Vehicle Examination Report (Gov't Ex. 6) sums up the violations noted by Smid, which was completed and signed after the arrest.  See, Gov't Brief, ¶ 25.

just started driving the rig "just down the road."

During the conversation with Duvall, Cutchember exited the tractor. Cutchember was wearing a Sysco uniform and hat, although the tractor-trailer was not a Sysco rig. He volunteered information about how they were not able to buy the tractor in California, showing Smid certain documents. Cutchember also stated that he had hired Duvall to drive the new tractor back. Smid testified that he felt that Cutchember was trying to divert Smid's attention away from Duvall and/or the rig. Smid eventually had to tell Cutchember to get back into the tractor and remain quiet so he could complete his inspection of Duvall. (41-42). Smid then asked Duvall for the tractor-trailer information. Cutchember handed Smid some of the information on the tractor-trailer. At this point, Smid's suspicions were aroused that there was something wrong with either the driver, the passengers and/or the load. Smid then asked Duvall if the logbook he (Duvall) had given to Smid was his, to which Duvall replied "no."

As Duvall was speaking with Smid about the logbook, Richard William Davis (Davis) stepped out of the tractor. Davis volunteered that he had rented the tractor from a friend because his tractor had broke down, and that he was trying to make some money. Smid then asked Davis for his logbook, which Davis produced. Upon examining the logbook, Smid noticed several contradictions between that logbook, and Cutchember's logbook: Davis had listed himself "Richard Davis" as the driver with no co-driver, which contradicted Cutchember's logbook; there was an inconsistency in the dates during which Cutchember stated he and Davis were off duty in Barstow, California; Cutchember's logbook did not show when and where they picked up their cargo; and the logbooks indicated that the rig traveled from Maryland to California without a load in the trailer. Smid thought this was highly unusual in that experienced truck drivers know that

4

they are losing money any time their trailer travels any distance when it is partially or completely empty.

      Smid then asked for Duvall's, Cutchember's and Davis' identification. Duvall again expressed being nervous about getting a ticket. Smid asked Duvall if he was just learning how to drive, since it was unusual to have three persons in the tractor unit, except when one of the persons present is being trained to drive. Duvall told Smid that he used to drive back home, that he was learning to drive cross-country, and that he had just switched to being the driver just down the road. Cutchember kept reassuring Smid that Duvall had a valid CDL. Continuing the inspection, Smid left the bay area to run Duvall's, Cutchember's and Davis' licenses. While he was running the license information on Duvall, Cutchember and Davis, Smid had his administrator call for assistance, to which New Mexico State Patrol Officer Seals eventually responded. At the hearing, Smid testified that he needed assistance to do a "cargo load securement check." (47).

      A license check by Smid revealed that while Cutchember and Davis had valid CDL's issued by the State of Maryland, Duvall did not have a valid CDL. Cutchember acted surprised when Smid informed him that Duvall did not have a valid CDL. Cutchember began to answer for Duvall from the tractor. Smid told Cutchember more than once to sit down in the tractor and that he was going to complete his inspection. Smid then reviewed the bill of lading he had been given, which was a carbon copy.

      When Officer Seals arrived, Smid informed him of his suspicions about Duvall, Cutchember and Davis, including the fact that Duvall had no CDL or medical card, and that the logbooks were inconsistent. Throughout the inspection process, Davis would periodically peek through and stick his head out of the curtain separating the sleeper area from the front cab portion

of the tractor. Smid then picked up the bill of lading and told Duvall that he was going to do a cargo load and securement check. (52). Smid told Duvall to unlock the lock and break the seal on the doors of the trailer. Duvall did not have the keys to the lock with him, and on Smid's direction, went to get the keys. Cutchember passed the keys to Duvall, and Duvall then went back to the end of the trailer while Cutchember remained outside of the tractor near the passenger side door.

While Smid and Duvall were at the back of the trailer preparing to open the door, Smid observed that Cutchember acted nervously by looking back and forth from the rear of the trailer toward the direction of Seals who was standing at the front of the tractor. Smid testified that Duvall unlocked the lock with the keys. When he had trouble breaking the seal with his hands, Smid broke the seal with his asp. Duvall removed the seal, and then Smid asked Duvall to open the trailer doors. Duvall complied with Smid's request and opened the trailer doors. (52-53). Duvall takes issue over whether Smid *took* the keys from Duvall and opened the trailer. Of course, the distinction has no significance if Smid's opening of the trailer was justified in carrying out a Level II inspection.

When the cargo doors were opened, Smid noticed several pallets of pomegranate juice staggered through out the trailer. Smid also noticed that within each pallet, the juice was stacked in several layers. Separating the layers of juice on each pallet was a piece of cardboard. Smid then noticed that towards the doors of the trailer on the driver's side there was a piece of cardboard standing vertically next to the wall of the trailer, about waist-high on Officer Smid. Smid looked over the cardboard and saw small brown boxes, about a foot and a half in size. One of the boxes

was marked "Potatoes."[4]  Smid remembered that the bill of lading did not have any "potatoes" listed as cargo.  Gov't Ex. 4.  Smid testified at the hearing that the boxes were not loaded and secured properly, itself another infraction.  The top box was partially closed and sealed with clear packing tape.  Smid testified that through a gap of about an inch, he saw a package of a white substance in the box, which he believed to be contraband.  Smid further testified that, based upon his training and experience, he believed that this type of packaging was consistent with the methods used by drug couriers who are attempting to conceal the odors of controlled substances.  (58-63).

      Smid then stepped down out of the trailer and had Duvall and the other Defendants handcuffed as a safety precaution if a further search of the box contents turned out to be contraband.  63-64.  Smid went back to the trailer, peeled back the tape from the partially opened top box and opened the lid further.  The box contained several packages vacuum-sealed in different colors of wrap and tape, which Smid believed to be bricks of cocaine.  (63).  Gov't Ex. 8I.  Smid returned to where Duvall, Davis and Cutchember were and separated them.  He then individually advised Duvall, Davis and Cutchember of their constitutional rights, and told then that they were under arrest for possession of a controlled substance."

      Smid then notified Drug Enforcement Administration ("DEA") agents who responded to the scene.  Smid cited Duvall for not having his own logbook , not having a medical certificate and for not having a commercial motor vehicle certificate.  Gov't Ex. 6.  The seized drugs and the Defendants were turned over to the DEA agents.   A sample of the 79 bricks turned over to

---

[4] The boxes may actually have been labeled as "frozen french fried potatoes."  See, Ex. 8G.

Agent Fuentes tested positive for the presences of cocaine, with a weight of approximately 92.5 kilograms.  Several items of non-drug evidence were seized as well, including cash, a prescription bottle, cash withdrawal receipts, handwritten notes, miscellaneous receipts, log books, a broken security seal, a package of unused security seals, three cell phones, title and other paper work relating to the rig and the cargo, a photo found inside the one of the boxes of cocaine, and a .32 caliber hand gun with ammunition that was found in a bag belonging to Davis.

## Discussion

The Defendants do not challenge the stop or the inspection itself, but rather that Smid's entry into the trailer exceeded the permissible scope of a Level II walk-around inspection.  They further contend that there could be no probable cause as required under the Fourth Amendment to justify a search of the trailer contents.

**I.      Legal standard**

Inspections conducted pursuant to a statute authorizing such searches fall within the exception to the warrant requirement for administrative inspections of "pervasively  regulated industries."  See, N.Y. v. Burger, 482 U.S. 691, 692 (1987) (based on New York statute).  This type of inspection does not violate the Fourth Amendment where the search was reasonable.  U.S. v. Vasquez-Castillo, 258 F.3d 1207 (2001) (citing Burger v. U.S., 482 U.S. 691, 716 (1987) (applying a three-part test).  Burger established a three-part test for determining whether a warrantless inspection of a closely regulated industry violates the Fourth Amendment: "First, there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made. Second, the warrantless inspections must be necessary to further the regulatory scheme. . . . Finally, the statute's inspection program, in terms of the certainty and

regularity of its application, must provide a constitutionally adequate substitute for a warrant." Burger, 482 U.S. 691, 702-03 (citations and internal quotation marks omitted). As part of this last prong, the rules providing for the inspections must provide notice that property may be searched for a specific purpose and must limit the discretion of the inspecting officers.  482 U.S. at 710-11; U.S. v. Knight, 306 F.3d 534, 536 (8th Cir. 2002) ("regulatory statute serves the function of a warrant because it explicitly limits the 'time, place, and scope' of the authorized search as the fourth amendment requires") (citing Burger, 482 U.S. at 703).   In other words, administrative inspections must still remain within the bounds of Fourth Amendment protections.

New Mexico statutes providing for "Procedures for Vehicles Entering or Leaving State" state in part:

C.  The person in charge of the port of entry may verify the information contained upon the billing or invoice and shall check the license, permit, engine and serial numbers, weight and description of the vehicle. The person shall inspect the vehicle and ascertain whether it is in safe and roadworthy condition, properly equipped with all lights, brakes and other appliances required by any statute of this state, in such condition as to be safe for operation upon the public highways of this state.

D. The person in charge of the port of entry may satisfy himself as to the contents of the cargo and, the weight thereof and is authorized to interview operators to obtain information in respect thereto and, if in doubt as to the declared gross weight, may order the cargo weighed before issuing any clearance certificate for the motor vehicle.

E.  The person in charge of the port of entry may inspect the contents of the vehicle to determine whether all taxes on gasoline and motor fuel and excise taxes on alcoholic liquors and all taxes on any other property have been fully paid.

F.  The person in charge of the port of entry may inspect the vehicle and its contents to determine whether all laws and all rules and regulations of the departments of this state with respect to public safety, health, welfare and comfort have been fully complied with.

N.M.S.A. 1978, § 65-5-1(C), (D), (E), & (F).  Defendants do not challenge the constitutionality of this statute.  They claim that, based on Officer Smid's conduct and statements, his entry into

the trailer was outside the purpose or scope of any of the above statutory provisions. They further contend that while Smid's stated purpose was to carry out an inspection, it was merely pretext for getting into the trailer.

In <u>Vasquez-Castillo</u>, the Tenth Circuit applied <u>Burger</u>'s three-part test to federal and New Mexico regulatory schemes. The Court held that an inspector's entry into the trailer at a port of entry inspection station was authorized under federal and state (New Mexico) regulatory schemes. The inspector decided to inspect blocking and bracing inside the trailer during a Level I inspection after finding irregularities in the bill of lading and the driver's logbook. The Court also held that the inspector had probable cause to further search the trailer when he detected the odor of raw marijuana upon entering the trailer. The Court in <u>Vasquez-Castillo</u> did not address whether an inspector can enter a trailer to inspect cargo because it found that an inspector must inspect the interior of a trailer to check the blocking and bracing. 258 F.3d at 1212, n.3. As the Government points out, there is a strong indication, however, that the Court would have found that an inspector does have such authority. <u>Id</u>. at 1211 (citing favorably and with emphasis N.M.S.A. § 65-5-1(F) ("[t]o determine whether the vehicle is safe, those in charge of the port of entry are permitted to 'inspect the vehicle *and its contents* to determine whether all laws . . . have been fully complied with.'" (emphasis added). Both sides have relied on <u>Vasquez-Castillo</u> to support their positions. Although the exact factual circumstances are different from the case before me, I find <u>Vasquez-Castillo</u> sufficiently analogous to the instant case to justify Smid's entry into the trailer, for reasons which follow.

**II.     Whether the regulatory search justified Smid's presence inside the trailer.**

The essence of all three Defendants' arguments is Smid's "cargo load securement check"

10

was beyond the scope or purpose of any of the regulatory provisions in § 65-5-1. Defendants contend that under § 66-5-1(C), Smid was not authorized to go beyond checking paperwork and driver documents; under § 65-5-1(D), Smid was limited to checking for the presence of pomegranate juice on board in order to verify the contents and weight of the cargo; under § 65-5-1(E), Smid could verify only that all taxes have been paid; and under § 65-5-1(F), Smid could determine whether the truck and its contents met all laws, rules and regulations affecting public safety, health, welfare and comfort.

There are several flaws in this position. One is that Defendants' reasoning requires one to totally disregard the observations noted by Smid during the inspection, as well as Smid's training and experience which would give him certain suspicions about something being afoot and lead him to the decision to check inside the trailer for a cargo load securement check. Smid made various observations during the initial part of the inspection -- observations which taken together, alerted his suspicions: Duvall was driving a tractor-trailer rig on Interstate 40 without a valid CDL and without a current medical card; inconsistencies in the logbooks belonging to Cutchember and Davis; brake and lamp violations on the rig; Cutchember wearing a uniform belonging to a trucking company different from the rig in which he was traveling; Cutchember's attempt to divert Smid's questioning; three people in the tractor where a driver was not in training; unusual amount of "off-duty" time in a tractor-trailer which means losing money for experienced truck drivers. Smid apparently thought these circumstances suspicious enough to call for assistance from the state police at that point in the inspection.

Another flaw is that Smid's inspection of the load was clearly permissible under both Level II and at least one of New Mexico's statutory provisions: § 65-5-1(C) ("and ascertain

11

whether it is in safe and roadworthy condition") and (F) (inspector "may inspect the vehicle and its contents" whether the load meets all laws, rules and regulations concerning "public safety, health, welfare and comfort"). Defendant Cutchember argues that the Level II walk-around inspection does not authorize entry into a trailer based on the text in § 65-5-1(C). This contention is implausible. First, a Level II inspection expressly provides for "safe loading" checks, which would envision an inspector's presence in the trailer. Second, subsection C allows an inspector to check that the truck is "in safe and roadworthy condition," which is not inconsistent with Level II's language providing for safe loading. Third, it is not at all clear that § 65-5-1 (B) through (F) track the different levels of inspections. Smid's encounter with a non-licensed driver operating an eighteen-wheeler, who had already committed several infractions, justified his decision to conduct a "cargo load securement check." Smid's conduct in entering the trailer was properly within the context of what <u>Burger</u> envisioned as an "otherwise proper administrative inspection" which happened to disclose violations not only of the regulatory statute, but also of the penal statutes. <u>Burger</u>, 482 U.S. at 692. Thus, Smid's presence inside the trailer was permissible under state and federal regulatory statutes.

**III.    Whether there was probable cause to search the compartment**

Legal justification for Smid's presence in the trailer, however, does not end the inquiry. The fact that Smid was authorized under a Level II search and a state regulatory statute to be inside the trailer does not inevitably lead to the conclusion that Smid was authorized to conduct further search of the contents. Defendants contend not only that a Level II inspection does not authorize entry into the trailer (which I have already addressed and concluded otherwise), but also that Smid had no probable cause to search the contents of the boxes.

Subsection (C) of §65-5-1 does not elaborate on what it means to "inspect the vehicles and its contents." The provision, by its language, could permit such a search, given the irregularities between the bill of lading and the apparent contents in the trailer. However, as Burger noted, a regulatory statute serves the function of a warrant because it explicitly limits the "time, place, and scope" of the authorized search as the Fourth Amendment requires. 482 U.S. at 703. Such a statute is not necessarily a substitute for probable cause. U.S. v. Knight, 306 F.3d 534, 536 (8th Cir. 2002) (where state trooper's authority to search truck was not authorized under Level III inspection under regulatory statute and was not supported by probable cause, handgun found in briefcase in back of driver's seat was suppressed as evidence)(citing Burger, 482 U.S. at 703).[5]

The question whether Smid had the statutory right under § 65-5-1 to inspect any of the goods that were in the trailer (particularly goods that were inconsistent with the bill of lading) need not be resolved, since I find that Smid had probable cause to open the box marked "Potatoes" when he saw a white powdery substance through a gap in the box. Defendants have raised a question regarding the credibility of Smid's statements, based on what Smid allegedly included in his written incident report. I do not dwell on this issue, for several reasons. First, Smid's incident report was not offered into evidence, and so is not properly considered here. Second, I find Smid's testimony to be credible, based on his prior experience as a police officer and as a Motor Transportation Division Inspector in encountering drugs in a tractor-trailer combination. See, U.S. v. Berrelleza, 90 Fed.Appx. 361, 365 (10th Cir. 2004) (deferring to

---

[5] In Knight, however, the officer rummaged through the driver's personal belongings as opposed to commercially transported cargo which is subject to regulatory checks in certain instances.

district court's decision that officer's testimony that the drug detection dog alerted, where videotape did not show it) (63).  Last,  I find that probable cause existed to search the contents of the box based even if Smid had not first seen a white powdery substance through a gap in the box before cutting it open.

Probable cause to search a vehicle is established if, under the totality of the circumstances there is a fair probability that the car contains contraband or evidence. United States v. Nielsen, 9 F.3d 1487, 1489-90 (10th Cir.1993) (internal quotation marks omitted).  Because probable cause is measured against an objective standard; hence, the subjective belief of an individual officer as to whether there is probable cause is not dispositive.  U.S. v. Davis, 197 F.3d 1048, 1051 (10th Cir.1999) (internal quotation marks omitted). "In determining whether probable cause exists, an officer may draw inferences based on his own experience." U.S. v. Mercado, 307 F.3d 1226, 1230 (10th Cir.2002).  Probable cause exists "where facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a prudent man in believing that an offense has been or is being committed." Marshall v. Columbia Lea Regional Hosp. et al, 345 F.3d 1157 (10th Cir. 2003).

The totality of the circumstances in this case supports a finding that Smid had probable cause to search  the contents of the trailer:  the driver's nervousness and confusion; the driver's lack of a valid CDL and other required documents, including a logbook; inconsistencies in the logbook with the driver's statement regarding cargo pickup; several contradictions between the two logbooks finally produced (Cutchember's and Davis'); a recent change in drivers; Cutchember's over-eagerness and repetitive vouching for Duvall trying to divert attention away from the inspection; and a carbon copy bill of lading which had not only carbon handwriting on it

14

but also original handwriting on it.  The fact that the inspection of the rig started out as a regulatory inspection does not prevent probable cause from arising later in the inspection.  See, Vasquez-Castillo, 258 F.3d at 1212 (citing U.S. v. West, 219 F.3d 1171, 1178 (10th Cir. 2000) ("It is well established that although probable cause to search a car may not exist when a car is first stopped for a traffic citation, it can arise during the course of the stop").

Once Smid was inside the trailer, there were sufficient indications to give Smid, trained to conduct such inspections, more than a mere suspicion that an offense was occurring.  See, Karr v. Smith, 774 F.2d 1029, 1031 (10th Cir.1985) (officer has probable cause "when facts and circumstances within the officer's knowledge. . . are sufficient to warrant someone of reasonable caution to believe that an offense has been or is being committed"); Brinegar v. United States, 338 U.S. 160, 175-76 (1949) (officer must have more than a mere suspicion of wrongdoing).  On entering the trailer, Smid could easily notice that there were boxes containing cargo that was not listed on the bill of lading.  Even assuming that the box was not partially open at the time, the totality of the other circumstances would give a trained motor transport officer good reason and authority to inspect, or a trained law enforcement officer probable cause to search, the contents of the boxes.  See,  U.S. v. Ashby, 864 F.2d 690, 692 (10th Cir. 1998), cert denied, 494 U.S. 1070 (1990) (Once probable cause exists for a search, the police have the authority to search the entire vehicle).

**IV.    Supplemental Issues**

At the hearing, Defendants raised issues regarding Smid's statutory authority to conduct inspections, and challenge his decision to perform a Level II search. I allowed counsel an opportunity to further brief the matter.  After reviewing these briefs, I am not persuaded to

15

change my initial inclinations and conclusions that Smid was duly authorized to perform the Level II inspection on the tractor-trailer.

A.     Smid's Certification

Defendants have challenged not only the integrity of the search Smid conducted but also his authority to carry out the inspection, based on the fact that Smid does not have a Certificate of Proficiency issued by the CVSA, the Commercial Vehicle Safety Alliance ("CVSA"). They make the argument that without this authority, the validity of Smid's conduct rests solely on whether there was reasonable suspicion for the stop, and probable cause for the search.

The Policy and Procedures for the Department of Public Safety governing Safety Inspections sets out certain requirements before an individual is certified to conduct Levels I through V inspections. The requirements include, *inter alia*, a passing grade on a written examination and demonstration in proficiency during on-the-job training and evaluation. Deft. Davis' Ex. 3 at 10. Defendants' reliance on this Policy to invalidate the inspection or search is simply incorrect, since it has no effect on Smid's authority to conduct the inspection.

At the time the tractor-trailer was inspected, Smid was a certified law enforcement officer, having completed his training at the New Mexico Law Enforcement Academy in Santa Fe. (10). As part of that training, Smid completed course work, both in the classroom and on-the-job in the area of motor transportation, and was certified as a transportation inspector by the Federal Motor Carrier Safety Administration. (11). Smid has done over a thousand inspections, close to 800 of them Level I inspections. (23). As an inspector and Motor Transportation Division officer, Smid encountered drugs in a tractor-trailer combination about 9 or 10 times (63). In response to the Court's inquiry at the hearing, Smid stated that he worked under the New Mexico Department of

Public Safety ("DPS"), in the Motor Transportation Division. The New Mexico State Police is another division under the DPS. (137). Smid confirmed that, as a certified Motor Transport Division Officer, he has the same law enforcement powers as a New Mexico State Police Officer in terms of vehicles that travel on state highways. (138). Defendants do not dispute the specific certifications Smid received while in training as a police officer. What they appear to argue is that unless Smid's certification was received through the process exactly described in the Policy and Procedures, Smid was not qualified to conduct the inspections, and his conduct was outside the scope of what he was authorized to carry out.

There is no merit to this contention, for the following reasons. First, even taking the Policy into consideration, the CVSA certification process does not envision or assume that someone (such as Smid) has met the requirements for certification through some other process such as a law enforcement academy. Since the DPS' Policy concerned Safety Inspections in General, it is safe to assume that the CVSA certification could be geared to any civilian wishing to become an inspector, and would not envision requiring an individual to become a law enforcement officer just to become authorized to do administrative safety inspections.[6] Defendants make much about Smid's not having a Certificate of Proficiency issued by CVSA. (70). It is undisputed Smid completed a CVSA approved North American Standard Inspection course, see, Gov't Ex.

---

[6] A law enforcement officer has broader authority than does a MTD inspector. See, N.M.S.A. § 65-1-9 (Notes of Decisions) (citing Op.Atty.Gen. Opinion No. 92-02 (March 11, 1992), 1992 WL 528476): "Although MTD inspectors are statutorily authorized to enforce the laws and regulations governing transportation for hire and commercial vehicles and, by agreement, to enforce excise taxes and other fees imposed by other state agencies, MTD statutes do not specifically grant them authority to enforce traffic laws against noncommercial drivers and vehicles . . . Thus, as long as the MTD inspectors are officers of a law enforcement agency, the Director can, through Section 66-2-12, authorize them to enforce the Motor Vehicle Code."

1, as well as all the other requirements which qualify him to receive that certificate. (145).  See, Gov't Ex. 1; see, e.g., U.S. v. Mendoza-Gonzalez, 363 F.3d 788, 791 (8th Cir. 2004) (noting inspector was certified by the Federal Motor Carrier Safety Administration to perform inspections).  Further, Defendants' contentions about the currency of Smid's certification are absurd.  An inspector has a full year in which to complete the required number of inspections to keep certification current.   (70-71; 149).  That would mean that until the last day of this year, Smid's certification is current.

Second, failure to follow a state policy and procedure has no bearing on Fourth Amendment violations. See, Glatz v. Kort, 807 F.2d 1514, 1517 n.4 (10th Cir. 1986) (federal due process claim cannot be based on a violation of state law "because state procedures do not define what is required under federal due process"); see also Kraushaar v. Flanigan, 45 F.3d 1040, 1049 (7th Cir. 1995) (failure to follow procedures that are required by state law but not by the federal Constitution establishes only a violation of state law).  The DPS' Policy and Procedure has no relevance to the instant motion.   In connection with this second point, and most damaging to Defendant's contention, is what the United States Supreme Court has to say about the constitutionality of a regulatory inspection which is conducted by a police officer instead of an administrative agent:

> Finally, we fail to see any constitutional significance in the fact that police officers, rather than "administrative" agents, are permitted to conduct the [administrative] inspection. The significance respondent alleges lies in the role of police officers as enforcers of the penal laws and in the officers' power to arrest for offenses other than violations of the administrative scheme.  It is, however, important to note that state police officers, like those in New York, have numerous duties in addition to those associated with traditional police work. . . As a practical matter, many States do not have the resources to assign the enforcement of a particular administrative scheme to a specialized agency. So long as a regulatory scheme is properly administrative, it is not rendered illegal by the fact that the

inspecting officer has the power to arrest individuals for violations other than those created by the scheme itself. In sum, we decline to impose upon the States the burden of requiring the enforcement of their regulatory statutes to be carried out by specialized agents.

Burger, 482 U.S. at 717-18. Accordingly, this aspect of Defendants' position is squarely rejected.

B.     Smid's Discretion to Conduct a Level II Search

Defendants argue that an inspector's discretion is not totally arbitrary, and take issue with Smid's decision to conduct a Level II search after first informing Duvall he would perform a Level III search. They contend that, unlike the facts in Vasquez-Castillo, the circumstances here did not justify changing the inspection to a Level II search. I find that there was. In Vasquez-Castillo, the inspector noticed that the trailer did not have a current CVSA decal and further observed other irregularities with the logbook and the bill of lading. Even if the trailer Duvall was driving had a current CVSA decal, there were other irregularities (discrepancies between logbooks, a driver who could not produce either a CDL or a medical certificate, and suspicious behavior, to repeat a few of the observations made by Smid) that are more than sufficient to support Smid's decision to conduct a Level II search. Further, there is nothing in the relevant policy and procedures, nothing in the New Mexico or federal regulatory statutes, and nothing in the protections afforded by the United States Constitution which would have precluded Smid's change-of-mind to go from a Level III to a Level II search so long as sufficient justification existed to conduct a Level II search. Therefore, I find that there is no merit to any of the issues argued in Defendants' supplemental briefs.

**V.     Cutchember's motion.**

Defendant Cutchember also seeks to suppress any evidence seized from his person as well

19

as his arrest, stemming from the alleged lack of probable cause to search the trailer. These requests are denied, given my finding that the search, and therefore resulting arrest and seizure, was lawful.

## VI.     Whether Duvall has standing to join in the motion to suppress

The Government contends that Duvall does not have standing to challenge the search and seizure of the evidence. Duvall did not respond to this issue in his brief. This issue will be denied as moot, given that the Government has dismissed the charges against Duvall.

## Conclusion

In sum, Officer Smid was duly authorized under state and federal statutes to conduct the inspection and be present inside the trailer. Further, I need not decide whether N.M.S.A. 1978, § 65-5-1(F) in itself justified Smid's search of the trailer contents, since I conclude that Smid had probable cause to conduct the search.

**THEREFORE**,

**IT IS ORDERED** that the Motions to Suppress filed by Defendants Davis, Cutchember and Duvall **(Doc. 47)**, **(Doc. 72)**, **(Doc. 49)** are hereby DENIED.

_____
UNITED STATES DISTRICT JUDGE